STEVEN G. KALAR
Federal Public Defender
GABRIELA BISCHOF
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
Email:         Gabriela_Bischof@fd.org

Counsel for Defendant Lockhart

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>BILLY JOHN LOCKHART,<br><br>Defendant. | No. CR 17-00604-CRB-001<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Date:** November 27, 2018<br>**Time:** 10:00 a.m.<br>**Court**: Hon. Charles R. Breyer |

# Table of Contents

**INTRODUCTION** ....................................................................................................................1

**BACKGROUND** .....................................................................................................................4

**I. History and Characteristics**..........................................................................................4

**II.     Offense Conduct**....................................................................................................5

**III.     Post-Offense Rehabilitation** ...............................................................................7

**IV.     Psychological Evaluations** ..................................................................................9

**V.     Recent Developments in Sex Addiction Research**..........................................12

**DISCUSSION** ........................................................................................................................12

**I.      A VARIANCE FROM THE APPLICABLE GUIDELINE IS WARRANTED BECAUSE THE CHILD PORNOGRAPHY GUIDELINE IS EXCESSIVE AND NOT BASED ON EMPIRICAL EVIDENCE (18 U.S.C. § 3553(A)(4))** ....................................................................................12

**II.      A NON-CUSTODIAL SENTENCE WILL BEST ACHIEVE THE PURPOSES OF PUNISHMENT**......................................................................................................18

    **A.   Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)** ...........................................19.

    **B.   Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A); Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)** ...........................22

    **C.   Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D)** ........................................................................24

**CONCLUSION** ........................................................................................................ 26

ii

*DEFENDANT'S SENTENCING MEMORANDUM*

**INTRODUCTION**

Undersigned counsel understands that Mr. Lockhart's guideline range is very high, and to request a non-custodial sentence in this case is an unusual thing. But this is an extraordinary case.

Mr. Lockhart suffered unimaginable abuse throughout his childhood. He was homeless, hungry, physically abused and neglected, and regularly molested by those who were supposed to protect him. His daily life was so bleak, lonely, and violent, that he submitted to the advances of sexual abusers because that attention and affection, no matter how wrong, provided a respite from the rest of his existence. But Mr. Lockhart was smart, driven, and kind; he was determined to survive, to escape, to be a success, and, eventually, to be of service to others. But he had to repress those memories of abuse and the feelings they generated to complete the countless tasks required to escape.

And he did escape: first to college in New York, then working with the ACLU, to Senegal with the Peace Corps, to Columbia for pre-med, Yale for medical school, and, finally, to UCSF for a medical residency. Not only did he escape, but he always put his talents to use in the service of others: after college he used his arts training to improve recreational activities for Alzheimer's patients; while studying pre-med, he volunteered as a medical translator for torture survivors from Guinea; in medical school he was elected president of the medical student council and worked with refugees in New Haven; as a medical resident at UCSF Hospital, he organized a newspaper editorial campaign and hospital petition drive to address issues of homelessness and under-treatment of severely mentally ill patients. He did all of this while excelling at school, working part-time, and battling his secret sex addiction.

Since his childhood, he had self-medicated for his trauma through masturbation, unconsciously holding the belief that summoning pleasure was more likely to lead him to happiness than the painful catharsis of facing his past abuse.  He used it to avoid every negative emotion, no small feat for a man handling the stresses of a dark past, a broken family, medical school and residency, volunteering, and romantic relationships.  At the height of his addiction, he was masturbating 4 to 8 hours per day, 30 hours per week. He tried to stop, but he couldn't. When he first sought help, sex addiction was so poorly

1

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

understood and the risks of honesty seemed so great, that what little help there was was ineffective. So his addiction continued.

It was only after becoming desensitized to every variant of mainstream adult pornography that he turned to taboo material, and eventually to illegal material, child pornography. At first, he identified with the children he saw, and was reminded of the rush of being desired that he associated with his childhood abuse. But as he desensitized to that as well, it became the taboo nature of the material that provided the stimulation more than the content. In fact, both psychological evaluators concluded that Mr. Lockhart is <u>not</u> a pedophile, and moreover, that his risk of recidivism is very low.[1] The child pornography and media he found written from the viewpoint of an abuser finally opened his eyes to what his childhood molestation had been -abuse- and what he had been: a vulnerable child targeted as a result of that vulnerability. An unhealthy romantic relationship and experimental drug use sent him further into his downward spiral. It all came to a crashing halt on the day of his arrest, May 9, 2017. His behavior in this case has been nothing short of abhorrent, a fact of which he is keenly aware. In his addiction, he had "become a stranger to myself, to my values, and to my sense of justice." After his arrest, friends worried that he would end his life. But instead, in a manner that is typical of him, he has taken heartbreak and worked ceaselessly to make a meaningful penance.

The collapse of his former life, and the public reveal of his most private struggles, has been a blessing in disguise. Freed from fears of losing his career, his home, and his friends and family, he has been able to address his childhood trauma, compulsive masturbation, and sex addiction. He started by checking into a monastery to focus on sexual sobriety, attending sex addicts anonymous meetings, finding a sponsor, participating in one-on-one therapy with sex offender treatment specialists, and submitting to drug testing. When he found a therapeutic technique that helped him immensely, he completed a training to become a facilitator and now leads a weekly Tuesday morning meeting. Pretrial services has monitored all of his computer usage, and he has had no violations of his pretrial release. In

---

[1] Mr. Lockhart was evaluated shortly after his arrest by a psychologist and again recently by a sex offender treatment specialist. Those reports are attached and filed under seal as Exhibits R, Longwell Report and S, O'Hara Report.

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

addition to his recovery activities, he also volunteered at a foodbank, with stroke patients, and with the Desert AIDS Project.

In search of a new career, he completed a rigorous coding bootcamp and has already used those skills to build resources for people with sex addictions and victims of abuse. He has also begun work on a website that collects resources for people suffering from sex addiction, a smartphone app that helps addicts track and respond to their triggers, and developed a proof of concept for a program that, using machine learning, could automatically find and destroy child pornography on the internet.

The letters of support submitted on his behalf speak volumes about his dedication to his own recovery, the recovery of other addicts, and atoning for his crime. Exhibits A-P, Letters of Support. Doctors risked their reputations to voice their continuing support for Mr. Lockhart. Friends he gained through sex addicts anonymous outed themselves in order to give the Court the clearest picture of Mr. Lockhart's genuine remorse, recovery, service, and potential. The progress he has made in less than two years is remarkable. Separating him from his support network and placing him into an environment likely to result in further trauma would jeopardize his recovery. Just as importantly, removing him from society will halt the fellowship he provides to other addicts, the services he performs in the community, and his coding work. His lifetime of service to others demonstrates that Mr. Lockhart can do more to atone for his crimes out of custody than he ever could inside a prison.

A sentence of time served, followed by seven years of supervised release, which will include a rigorous treatment plan consisting of a short-term partial hospitalization component, group therapy for sex addiction and individual therapy for trauma recovery, intensive supervision, drug testing, polygraphing, and a lifetime of sex registration, constitutes just punishment in this case. Undersigned counsel respectfully requests that the Court impose that sentence.

3

# BACKGROUND

## I. History and Characteristics

Mr. Lockhart recalls his childhood in his own words in his letter to the Court (Exhibit Q) and other details are thoroughly set forth in the PSR. In short: he was an effeminate, gay kid, in a rural Texas town, with absentee, addict parents, no money, no stability, daily violence, and strict orders that "what happens at home stays at home." Exhibit B, Letter from Carol Coy. Even his doting grandmother had no idea of the abuse and neglect that formed his daily existence. *Id.* As a child, his mother's boyfriend beat and terrorized him. PSR ¶ 60. He perceived the continuous sexual abuse he endured as an escape from his daily misery which, of course, was exactly the reason his abusers chose him to victimize. He welcomed the affection and attention and physical pleasure. He was, by that time, used to keeping secrets for adults. "When asked whether his mother was aware of the sexual abuse, he stated there would be no point in telling her." ¶ 62.

The only way to end the abuse was to leave Texas. His sophomore year of high school, he got a scholarship to study abroad in France but his joy and freedom was cut short. ¶ 61. His host father recognized his vulnerability and preyed on him, plying him with a sleeping pill and raping him while he was incapacitated. *Id.* Billy told no one. *Id.*

When he returned home to Texas, his mother had given birth to his little sister, Lenna. She writes, "It was as if God had brought him back to care for me. His experience made him protective of me, and we were bonded from that day forward." Exhibit B, Letter from Lenna Berlekamp. He adored her, but found himself often saddled with a baby when his mother disappeared for days at a time. ¶ 60. He left Texas for college in New York when Lenna was 3. He was riddled with guilt about leaving her behind, but he had no way to care for a small child. He watched over her by sending her books, contacting her teachers, and driving to Texas from New York to be there on her first day of kindergarten. Exhibit B. Nearly five years later, while Billy was in Senegal, CPS intervened and placed Lenna with their grandmother. ¶ 60. Billy wrote letters to the court about his own childhood, so that Lenna would not be returned to their mother. Eventually, he returned home early from the Peace Corps

4

to help Lenna acclimate to her new life with their grandmother, before heading back to New York for pre-med studies. ¶ 105.

Even in his darkest days and leanest times, he endeavored to be of service to others. In high school, he raised money through his drama program for children born with HIV. ¶ 59. After college he worked as a full-time event planner for the ACLU. ¶ 106.  While taking the prerequisites for medical school, he worked as a medical and legal translator for victims of torture from the Guinea. In medical school, he was elected by his own classmates to be president of the entire medical school student body, and of the LGBT medical student organization. Exhibits L, Letter from Benjamin Margolis, and M, Letter from Julius Oats. Mr. Lockhart did not perform acts of service after his arrest simply to avoid jail; those acts of service are part of who he is and has always been.

## II.      Offense Conduct

As set forth above, the stresses in Mr. Lockhart's life didn't end when he left Texas. His mother's alcoholism and its effect on his sister, the continued poverty that steered him to sex work, the demands of his medical career, and his failure to set healthy boundaries in romantic relationships followed him. Whenever he suffered, he turned to masturbation and casual, unprotected sex to relieve stress. But that coping mechanism could not withstand the amount of stress in his life, and in periods of difficulty, it turned into an addiction that consumed him. In medical school, while weathering the breakup of his first serious relationship, he began to masturbate compulsively. He was also having unprotected sex with strangers, sometimes multiple men in a night. ¶ 81; Exhibit Q. When he sought help at Yale Mental Health, they knew little about sexual addiction. His psychiatrist incorrectly diagnosed him with bipolar disorder, and they tried a series of medications to constrain his hypersexuality to no avail. ¶ 79. She cautioned him to focus on masturbation as a harm reduction technique, but clearly did not predict the adverse effects her advice would have on his conduct. ¶ 80.

His compulsive, 30-hour-per-week masturbation habit soon exhausted the available supply of mainstream internet porn, and he needed an ever increasing shock value to remain stimulated. ¶ 80. After learning about the dark web, he looked at child porn for the first time. He abhorred his own

5

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

behavior but was too afraid he would be reported to discuss it with a therapist. After medical school, he went to a Buddhist monastery to seek help for his sex addiction and found the techniques he learned there helpful. Exhibit Q. Although he could not stop completely, he regained some sense of normalcy. He moved to San Francisco to begin his residency at UCSF.

He was drawn to psychiatry because he wanted to help people, and he wanted to figure himself out. Like most psychiatry residents, he expressed an initial interest in child psychiatry. ¶ 24 This lack of judgment and denial is maddening, but also understandable: he knew he would never harm a child, and never thought his addiction would spin so out of control that his compulsive sexual behavior would be discovered. Even had he pursued this, his only contacts with children would have been supervised and occurred in his third year of residency. *Id.* He was arrested in his second year. *Id.* In fact, he spent most of his time as a resident working with the homeless in crisis at San Francisco General Hospital and in San Francisco County Jails. Exhibit Q. That stress and the stress of another faltering romantic relationship caused a rapid decline in his mental health and behavior. His relationship with Benjamin Martin was unhealthy, and the two seemed to unwittingly bring out the worst in each other. Together, they used illegal drugs and took steroids. *Id,;* ¶ 66. Disinhibited and consumed by insecurities, Billy masturbated in all of his free time, and eventually turned back to extreme taboo images. As his friend Matthew Lowe explains it, "[n]o one who knows or meets Billy would ever believe that he is a sadist, and I honestly believe that Billy is not a pedophile, and that like a drug addict searching for an every increasing thrill, his use of child porn represents the depth of his despair and losing himself in his addiction." Exhibit D, Letter from Matthew Lowe.

In his addiction, he allowed himself to pretend that watching the abuse would have no impact on the real world, and that the abuse he experienced as a child "wasn't that bad". He writes:

> "My illusions were finally shattered when I opened a link to a set of illegal files that included guides written by pedophiles instructing other pedophiles about how to 'hunt' children. I looked in them for insight into my own history, and they firmly dismissed any notion I formerly entertained that what I had experienced as a kid wasn't abuse. On those pages, I realized that I was the 'special child,' the one 'whose parents leave unattended, who is lonely, who responds to adult attention disproportionately.' I was targeted for my availability and neglect as a child. I was just an instrument of pleasure to the men who

6

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

molested and raped me. And now what had I become? I felt guilt and self-disgust at my behavior…"

Exhibit Q.

On March 8, 2017, the National Center of Missing and Exploited Children (NCMEC) learned that an image of child pornography was uploaded using a UCSF IP address. ¶ 7. San Francisco Police Department then determined that the port that had been used was assigned to Mr. Lockhart. ¶ 8. Thereafter, they obtained a search warrant for the residence he shared with Mr. Martin and executed it on May 9, 2017. ¶ 10. The officers seized several devices including Mr. Lockhart's MacBook, Mr. Martin's laptop, and several external drives. ¶ 11.  Review of the devices uncovered child pornography. The material depicted prepubescent children, including infants, and included the display of genitalia, fondling, masturbation, oral copulation, vaginal and/or anal penetration, and/or sadistic and/or masochistic conduct. ¶ 20. Police also found document files that had descriptive narratives of child abuse and exploitation, as well as descriptions of the psychological effects of abuse and how victimizers choose their victims. ¶¶ 15; 21. Forensic review also uncovered evidence that Mr. Lockhart distributed child pornography via Skype on several occasions in 2014 and 2015 while he was living in Connecticut. ¶ 23.

The investigation and subsequent forensic review did not uncover any evidence indicating that Mr. Lockhart had chatted or tried to chat with children, or had committed any sort of contact offense. As a result of his position at UCSF, Mr. Lockhart's arrest and prosecution was highly publicized and articles were published by the San Francisco Chronicle and CBS news, among other outlets. Many articles directed anyone who had been victimized or had suspicious contact with Mr. Lockhart to contact the Police Department's Special Victims Unit.[2] There have been no allegations of contact offenses.

**III.    Post-Offense Rehabilitation**

In the months following his arrest, Mr. Lockhart often considered suicide. "During these intense months that I have known Dr. Lockhart, he has struggled with his personal shame, guilt and remorse for his crime and even has reached out to me when he has had suicidal thoughts - so deep has been his despair. But I have seen him come to terms with the fact of his own culpability and come to a decision

---

[2] *See e.g.*  https://sanfrancisco.cbslocal.com/2017/05/15/ucsf-psychiatrist-pleads-not-guilty-to-child-porn-charges/

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

that suicide is never a way out." Exhibit E, Letter from Jeffrey Kerns. Instead of ending his pain, he struggled through it with his characteristic industriousness and determination.

He began by checking himself back into a monastery where he focused on his sexual sobriety. ¶ 69. After that, he began to voluntarily explore treatment options, eventually settling on the plan he uses today. Mr. Lockhart's treatment regimen is intensive. He attends three 12-step meetings per week, including facilitating a S.M.A.R.T. (Self-Management and Recovery Training) recovery meeting, communicates with his sponsor daily, supports other people in recovery, completes random drug testing, submits to full computer monitoring, reports to pretrial services, and participates in 1-on-1 counseling with a sex offender treatment therapist. ¶¶ 81; 90. In addition to activities directly related to treating his sex addiction, he also devotes many hours to community service. He serves breakfast and lunch weekly at the Neurovitality Center for Long Term Stroke Rehabilitation; volunteers at the LGBT Center of the Desert's food bank; volunteers for the Desert AIDS Project fundraisers and community events; served as secretary, once a week for six months, at the Sex Addicts Anonymous meeting; and completed a 30 hour S.M.A.R.T training program. ¶ 68. The therapy he has pursued has given him an even deeper understanding of his conduct, and generated an even more profound remorse. He writes: "I am haunted by the knowledge that I have participated in the degradation of innocent children. That having suffered similar abuse myself caused me to eliminate my empathy for them rather than to enhance it. That in trying to make my own escape through my addiction, I allowed myself to view materials which, by mere virtue of their existence and use, are a continuing source of trauma for others. I live in the hope that I can make some amends through work." Exhibit Q.

Mr. Lockhart knew he would never work as a physician again, so he enrolled in and completed an intensive coding bootcamp. ¶ 95. He has already begun to put his new skills to work, developing a resources website for sex addicts, a smart phone application to help addicts track and respond to their triggers, and most significantly, a program using machine learning that could automatically find and destroy child pornography on the internet based on its particular known features like pixel size and pattern, search terms, or trademark size. ¶¶ 71; 74; Exhibit Q. It is his hope that the program could make

8

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

a difference in the lives of child pornography victims, and that "[t]he sense of shame that would be lifted from them knowing they had their privacy returned would hopefully in some small way contribute to their healing." Exhibit Q. His creative mind is always searching out ways to make amends. In the future, he dreams of becoming a recovery coach and running a rehabilitation and inpatient treatment center for sex and drug addicts with a physician friend of his who is also in recovery. ¶ 74.

### IV. Psychological Evaluations

#### a. Dr. Kathleen Longwell Evaluation, July 2017

In July 2017, two months after his arrest, Mr. Lockhart was evaluated by psychologist Kathleen Longwell, PhD. Exhibit R. He was at the beginning of his recovery and Dr. Longwell noted that "[h]is self-awareness and insight was above average as expected of someone in a psychiatric residency program. His judgment with regard to his sexual and romantic behavior was deficient." *Id.* at p. 13.

Dr. Longwell performed a variety of testing designed to elicit an objective understanding of Mr. Lockhart's "current psychological condition and personality structure." *Id.* Importantly, "[i]t should be noted that Dr. Lockhart has not been trained in any of the psychological instruments administered during this examination." *Id.* She first tested him using Minnesota Multiphasic Personality Inventory-II-Restructured Form (MMPI-2-RF), an empirically based form designed to assess a broad spectrum of personality patterns and psychological disorders. *Id.* at p. 14. His results were consistent with anxiety-related disorders, including PTSD (Posttraumatic Stress Disorder). *Id.* Dr. Longwell also tested for major psychiatric disorders. "The Millon Clinical Multiaxial Inventory-IV (MCMI-4) is designed to assess long-standing problematic personality traits and clinical symptoms that correspond to the Diagnostic and Statistical Manual of Mental Disorders (DSM) system. *Id.* at p. 15-16. "He did not score in the significant level for any acute clinical psychopathology" but endorsed histrionic personality traits associated with being attention-seeking, dramatic, and temperamentally fickle, as well as masochistic traits including codependency and belief in his own worthlessness. *Id.*

Dr. Longwell also completed a risk assessment to evaluate Mr. Lockhart's likelihood of recidivism. She notes: "[t]he commonly used assessment tools to measure sexual recidivism are not

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

appropriate for subjects who have not been at least accused of one hands-on sex offense. The only well researched, published, and validated predictive accuracy tool available to assess recidivism among adult male child pornography offenders is the Child Pornography Offender Risk Tool (CPORT), developed by Michael Seto, Ph.D." *Id.* Mr. Lockhart scored a one on a scale of zero to five. "Offenders with a score of one on the CPORT had approximately a 4% probability of being charged with a new sexual offense of any type, including a new child pornography or contact sex offense within 5 years following their release from custody."

Dr. Longwell concluded decisively that "Dr. Lockhart is not a pedophile and is not sexually aroused by the notion of engaging in sex with children. Rather, Dr. Lockhart is masochistically sexually aroused by identifying with the victims in child pornography. He experienced a temporary relief when he fantasized about being dominated and punished by a father-figure. A vicious cycle emerged of his experiencing temporary relief from anxiety, followed by feeling more perverted, anxious, and disgusted with himself." *Id.* at p. 18.

### b. Sharon O'Hara, MFT, Evaluation, November 2018

Sharon O'Hara is a licensed marriage and family therapist, a certified sexual addiction therapist and supervisor (CSAT-S), and a longtime sexual offender treatment provider, certified by the California Sex Offender Management Board. In her psychological evaluation, she assessed risk of recidivism, provided a working diagnosis, and recommended a comprehensive treatment plan. Exhibit S. Ms. O'Hara too administered the CPORT assessment, also scoring Mr. Lockhart as a "1" indicating a 4.2% risk of reoffending. *Id.* at p. 8. Ms. O'Hara then administered the Level of Service/Case Management Inventory which measures criminal history and sociopathic ideation. Mr. Lockhart scored a 4 out of 43 possible points, scoring "very low" on measures of sociopathic disposition. *Id.* at p. 10. Ms. O'Hara concluded that Mr. Lockhart "is the opposite of a narcissistic sociopath." *Id*. Ultimately, she "diagnosed Billy Lockhart with Trauma-Induced Sexual Addiction/Compulsivity and Complex Post-Traumatic Stress Disorder."

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

As a result of her findings, Ms. O'Hara recommended a comprehensive treatment plan for Mr. Lockhart. She recommended he enroll in Blue Tiger Recovery's intensive, short term program, which is an exceptionally good fit for child-porn-only sexual offenders. *Id.* at p. 9. The 12-day program is termed a "partial hospitalization" program, but participants live in assigned sober living environments, so the experience is similar to residential treatment. The program takes an evidence based, eclectic approach, incorporating individual and group therapies. The treatment techniques, approaches and modalities used may include Mindfulness Exercises, Body Based Trauma Work, Relapse Prevention Work, Attachment Theory, Family Systems, Cognitive Restructuring Exercises and Tasks, Object Relations, Gestalt, Voice Dialogue, Resource Tapping Techniques, Communication Building and Trauma Analysis. Ms. O'Hara recommended that after completing the program, Mr. Lockhart should pursue weekly group therapy with other no-contact, porn-only offenders, as well as individual sessions devoted to sexual trauma recovery for a minimum of one year. *Id.* Finally, Ms. O'Hara proposes supervision and monitoring, specifically the Containment Model. *Id.* Federal probation officers currently implement what is known as the containment model of supervision of sex offenders, including child pornography offenders, on federal probation or supervised release.[3] "The containment approach operates in the context of multi-agency collaboration, explicit policies, and consistent practices that combine case evaluation and risk assessment, sex offender treatment, and intense community surveillance, all designed specifically to maximize public safety. . . . There are three anchors in containment-focused risk management: (1) supervision, (2) therapy, and (3) polygraph examinations." *Id.*

Ms. O'Hara's ultimate conclusion is as follows: "I do not see from the clinical evidence that Billy could be considered a pedophile or, in actuality, a danger to any actual children or minors. I would strongly suggest an intensive, combined program of sexual addiction/sexual offender therapy instead of

---

[3] In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines or non-production offenders. See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"] at p. 284, available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_10.pdf

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

incarceration, as being in the best interest of both Mr. Lockhart and society being safer." Exhibit S at p. 10.

### V.        Recent Developments in Sex Addiction Research

At the time that Mr. Lockhart first sought help for his addiction, doctors were skeptical about whether it was even a diagnosable disorder, let alone whether traditional addiction treatment methods would be effective. Sex addiction or compulsive sexual behavior is still not listed as a disorder in the DSM-V (Diagnostic and Statistical Manual of Mental Disorders), the go-to text for clinical diagnosis of mental disorders in America. It was not until June 2018, well after Mr. Lockhart's arrest, that the World Health Organization included compulsive sexual behavior in the ICD-11 (International Classification of Diseases). It defines compulsive sexual behavior disorder as a "persistent pattern of failure to control intense, repetitive sexual impulses or urges resulting in repetitive sexual behaviour." There are now 38 neurological studies that suggest substantial similarities with addictions. *See* attachment to Exhibit S. This new recognition and working definition will create funding for research around sex addiction, and acceptance of the condition as a mental disorder. The change has not gone unnoticed in the recovery community. "I am grateful to realize that as of this summer, Compulsive Sexual Behavior Disorder has been deemed by the World Health Organization as a mental illness, not a moral wrong or a mental weakness. Like the larger cultural transformation about addiction years ago when AA began, I am so grateful for this new enlightened perspective that will give people, like Dr. Lockhart, a path to healing and recovery." Exhibit E, Letter from sponsor Jeffrey Kerns. Growing acceptance of sexual compulsivity as a legitimate addictive disorder has now made more diverse and apparently effective treatments available to Mr. Lockhart and other people suffering from compulsive sexual behaviors.

### DISCUSSION

In sentencing Mr. Lockhart, this Court must consider all of the directives set forth in 18 U.S.C. section 3553(a); the sentencing guidelines are only one factor among many to be considered by the Court. See *United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558,

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Mr. Lockhart agrees with the guideline calculations as set forth in the Plea Agreement and Presentence Report. The applicable Guideline in this case is § 2G2.2. Mr. Lockhart starts at base offense level 18, but that level is increased substantially by a number of sentencing enhancements. The offense level is increased by two because the images at issue were located on, and shared via, a computer. *See* Guideline § 2G2.2(b)(6) ("use of a computer"). The offense level also is increased by five levels because, under the child pornography Guideline, any individual with more than 600 images of child pornography receives a five-level enhancement. *See* Guideline § 2G2.2 (b)(7)(D). Mr. Lockhart receives a two-level enhancement for possessing images that contained pre-pubescent minors (§ 2G2.2 (b)(2)), a four-level increase for possessing images that contained sadistic material (§ 2G2.2 (b)(4)), and an additional two-level increase for distribution (§ 2G2.2 (b)(3)(F)). Three levels are subtracted because Mr. Lockhart accepted responsibility for his conduct. *See* U.S.S.G. § 3E1.1. The resulting total offense level is 30.

Although his applicable guideline range is 97 to 120 months, there are many reasons for the Court to vary downward. Probation has recommended a sentence of 60 months in recognition of the many mitigating factors in this case, but as set forth below, a sentence of time served followed by 7 years of supervised release with strict conditions of supervision will best achieve the purposes of punishment set forth in § 3553(a)(2).

I. **A VARIANCE FROM THE APPLICABLE GUIDELINE IS WARRANTED BECAUSE THE CHILD PORNOGRAPHY GUIDELINE IS EXCESSIVE AND NOT BASED ON EMPIRICAL EVIDENCE (18 U.S.C. § 3553(A)(4))**

Ordinarily, the Guidelines are entitled to deference because they are the product of years of careful study. When a particular guideline is *not* the result of careful study or empirical analysis, by contrast, such deference is unfounded. *See Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007). In *Kimbrough*, a case involving the sentencing disparity between crack cocaine and powder cocaine offenses, the Supreme Court held that district courts have discretion to vary from a correctly calculated

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id.* at 101. In particular, the Court recognized that when guidelines are not the result of "empirical data and national experience, guided by a professional staff with appropriate expertise," they do not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109. In such cases, sentencing courts may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id.* at 110.

The Ninth Circuit has reached the same conclusion regarding Guideline 2G2.2. *See United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011). Not only does the *Henderson* decision recognize that "district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case," *Id.* at 963, but it holds that a district court "commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical policy disagreement with them," *Id.* at 964.[4]

The Guidelines for child pornography offenses have increased dramatically over the years, and in nearly every instance, these increases were mandated by Congress, often over the objection of the Sentencing Commission. *See Henderson*, 649 F.3d at 960-62. The original child pornography Guidelines created a base offense level of 13 for the crime of transporting, receiving, or trafficking in child pornography. *Id.* at 960. When possession of child pornography was criminalized in 1990, the Sentencing Commission created a new guideline for that offense, with a base offense level of 10 and a 2-level enhancement for material involving a prepubescent minor. *Id.* (citations omitted). Congress was not satisfied, however, and has, several times over several years, directed the Commission to increase

---

[4] Other Circuits have reached similar conclusions. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (holding that § 2G2.2 is "fundamentally different" from other Guidelines and that, unless it is "applied with great care, it can lead to unreasonable sentences that are inconsistent with what § 3553 requires"); *United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010) (holding that § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role and that district courts may vary on a policy basis from it); *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010) (holding that the district court committed procedural error when it concluded that it could not consider a broad, policy-based challenge to the child pornography Guidelines); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (holding that district courts may disagree with § 2G2.2 because it is based on Congressional directives, and not on the Commission's empirical approach).

14

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

penalties for child pornography offenses. *Id.* at 960. Congress made direct amendments to the Guidelines with the enactment of the 2003 PROTECT Act, adding image number and sadistic image enhancements that are now present in virtually every case. *Id.* at 961. In sum, the child pornography Guidelines have been substantively revised nine times during their 23 years of existence. Most of the revisions were Congressionally-mandated and not the result of an empirical study. As the Commission itself has explained, "The frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id.* (citation omitted).[5]

The result is that many of the individuals sentenced under § 2G2.2 face sentences that are excessive and unwarranted. Mr. Lockhart's case is illustrative. When the Commission promulgated the first set of guidelines in 1987, Mr. Lockhart's total offense level, after acceptance of responsibility, would have been 17, with a corresponding *mandatory* Guideline range between 24 and 30 months. U.S.S.G. § 2G2.2 (Nov. 1, 1987); *see also United States Sentencing Commission, The History of Child Pornography Guidelines* (Oct. 2009) at 10-11.[6] Under the Guidelines adopted in 1991 his Guideline range would have been 37-46 months. U.S.S.G. § 2G2.2 (Nov. 1, 1991). Had he been sentenced under the 2001 version, his sentencing range would have been 51-63 months. U.S.S.G. § 2G2.2 (Nov. 1, 2001). After Congress passed the PROTECT Act of 2003, the applicable Guidelines range for Mr. Lockhart's conduct increased yet again, and by the time the Sentencing Commission implemented all of the changes mandated by the PROTECT Act, Mr. Lockhart's advisory range had increased to the current 97-120 months.

The escalating Guideline ranges in child pornography cases have caused "widespread dissatisfaction" among district court judges. *United States v. Apodaca*, 641 F.3d 1077, 1083 (9th Cir.

---

[5] Not only were these revisions mandated without regard for the Commission's input, but many were "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate." *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008).
[6] *Available at*: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf.

15

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

2011) (citing U.S.S.C., *Results of Survey of United States District Judges January 2010 through March 2010* (2010) ("Judicial Survey"). The judiciary's discomfort with the child pornography guidelines is reflected in the sentences imposed. In fiscal year 2017, more than seventy percent of the sentences imposed were below the advisory § 2G2.2 guideline range. *See* U.S.S.C, *2017 Sourcebook of Federal Sentencing Statistics* (2017) at Table 28.[7] [8]

Section 2G2.2's overly harsh sentencing ranges also run afoul of the requirement that the sentencing court impose a sentence based on the individual characteristics of the offender. *See* 18 U.S.C. § 3553(a); *see also Henderson*, 649 F.3d at 965 (Berzon, J., concurring). As Judge Berzon notes, "an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the statutory maximum term," a result which "stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual.'" *Id.* (citation omitted).

Indeed, the "enhancements" for use of a computer and number of images are particularly meaningless because nearly every case involves a computer, and with a computer the number of accessible images is astronomical. *See, e.g.*, *United States v. Carrie Myles*, 16-CR-409 HSG (N.D. Cal. 2017) (granting variance because "use of a computer" enhancement applies in every case and is not a useful indicator of criminal activity); *United States v. Christopher Lee Carignan*, 15-CR-003 VC (N.D. Cal. 2016) (varying from advisory range because of "problems" with the "use of a computer" enhancement and the enhancement for the number of images possessed). Even print *adult* pornography is a dying art form. Playboy magazine stopped publishing nude photographs in print three years ago because pornography is so readily available on the Internet. *See* Ravi Somaiya, *Nudes are Old News at Playboy*, NEW YORK TIMES, Oct. 12, 2015. Most adults view and/or download legal pornography over the Internet by using a computer, tablet or similar device, and this applies to the illegal consumption of child pornography as well. *See Id.* ("Pornography magazines, even those as storied as Playboy, have lost their shock value, their commercial value, and their cultural relevance."); *United*

---

[7] *Available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf.
[8] Specifically, of the 1,403 total cases sentenced under § 2G2.2, only 35 were above the range, 376 were within the range, and the remaining 992 were below the range. *Id.*

16

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

*States v. R.V.*, 157 F. Supp. 3d 207, 232-36 (E.D.N.Y. 2016) (explaining how the "Internet revolution enabled child pornography consumption"). As one district court judge has observed:

> [T]he enhancements for use of a computer and images containing children under age twelve are typical of this crime. Further, given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy, yet carries a 5 level enhancement . . . . The other large enhancement defendant received—4 levels for portrayal of sadistic conduct—applies whether or not the person specifically intended to possess such material, *see* U.S.S.G. § 2G2.2 cmt. n.2, which seems an odd way of measuring culpability.

*Hanson*, 561 F. Supp. 2d at 1009. These concerns are borne out by the fact that at least one specific offense characteristic applied in 99.9% of the cases sentenced under § 2G2.2 in fiscal year 2017. *See* U.S.S.C, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2017*.[9] Because the enhancements apply in virtually every case, there is little room for the sentencing court to distinguish between more and less culpable offenders. Indeed they are not offense characteristics at all but considerations that are innate to the offense. In particular, § 2G2.2 makes it difficult to "differentiate between those who create child pornography and those who consume it." *United States v. Cruikshank*, 667 F. Supp. 2d 697, 701-02 (S.D.W.Va. 2009).

Yet another problem with § 2G2.2 was identified by Judge Berzon in her concurring opinion in *Henderson*: Section 2G2.2 often recommends "longer sentences for those who receive or distribute images of minors than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors." *Henderson*, 649 F.3d at 965 (Berzon, J., concurring) (citation omitted). For example, a person pleading guilty to enticing a child to cross state lines and then molesting the child would have a lower recommended Guidelines range than Mr. Lockhart.[10] The sentences produced by other Guidelines that address very serious, violent conduct further highlight the excessive ranges produced by § 2G2.2: had Mr. Lockhart robbed a bank and brandished a gun to threaten bank employees, and committed a carjacking to effectuate his getaway, he would face an offense level 26;[11]

---

[9] *Available at:* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2017/Use_of_SOC_Offender_Based.pdf

[10] *See* USSG § 2G1.3 (base offense level 28 plus 2 levels for an offense involving a sexual act or sexual conduct minus 3 levels for acceptance of responsibility results in adjusted offense level of 27).

[11] Guideline § 2B3.1(a) sets a base offense level of 20, to which two levels are added when a financial institution is robbed, and an additional five levels are added for the brandishing of a firearm, and two more for the carjacking,

17

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

had he assaulted someone with the intent to commit a second degree murder and caused his victim a life-threatening injury, his offense level would be 28.[12]

In summary, the Guidelines usually are considered a cornerstone of reasonableness, but only because it is assumed that each section was "the product of years of careful study." *United States v. Claiborne*, 439 F.3d 479, 481 (8th Cir. 2006). Where, as here, it has been established that the Guidelines were not a product of careful study or empirical analysis any presumption that the child pornography Guidelines are reasonable is unfounded. Accordingly, the range articulated under § 2G2.2 should be afforded little or no weight. Mr. Lockhart requests that the Court vary downward to account for the guidelines lack of empirical and practical support.

## II. A NON-CUSTODIAL SENTENCE WILL BEST ACHIEVE THE PURPOSES OF PUNISHMENT

Mr. Lockhart's case overflows with valid bases for a downward variance: extraordinary physical or sexual abuse suffered as a child, lack of guidance, his lifetime of public service, the ruin of his livelihood and reputation, vulnerability to assault in prison, his extraordinary acceptance of responsibility and post-offense rehabilitation, his low risk of recidivism, strong family and community support that aids rehabilitation, as well as the collateral consequences of his conviction, but all of these factors are best viewed through the lens of the purposes of sentencing.

Here, all of the purposes of sentencing point in the same direction. Mr. Lockhart's offense is less serious than the offenses Congress had in mind when it adjusted the guidelines, and Mr. Lockhart is not the dangerous contact offender Congress envisioned. His risk of recidivism, both statistically and individually, is very low. Accordingly, incarceration is not necessary to protect the public, and would actually hinder Mr. Lockhart's recovery. Moreover, because production, trading, and viewing of child pornography takes place in a global market, it cannot be significantly impacted by severe penalties in the

totaling 29 from which three levels would be deducted for acceptance of responsibility, resulting in an results in adjusted offense level of 26.

[12] Guideline § 2A2.1(a) sets a base offense level of 27, which would be increased by four levels for the life-threatening injury, adjusting the offense level to 31. With a three level reduction for acceptance of responsibility, the total offense level is 28.

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

United States and incarcerating Mr. Lockhart would not be an effective general deterrent. However, because many child pornography images are the same ones circulated over and over, it *could* be impacted by the program Mr. Lockhart has begun work on: one that seeks out child pornography using its unique, stationary features, like placement of the pixels in an image or certain movements in a video, and then automatically destroys it. Finally, removing Mr. Lockhart from his newly formed support network would hinder not only his rehabilitation but theirs as well.

**A. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A); Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)**

Mr. Lockhart is not the kind of offender deserving of a long sentence, and the collateral consequences of his conviction alone send a strong message about the seriousness of the conduct. Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters. Aside from the lack of evidence to support this belief in general, see *Child Porn Report* at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"), Mr. Lockhart is not a pedophile, and never molested or attempted to molest a child. Exhibit R; Exhibit S. The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Child Porn Report* at 204. Immediately, this sets Mr. Lockhart (and the seriousness of his offense) apart from the offenders Congress had in mind when it set the applicable guideline range. See e.g. *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting the government's argument that the guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"). Moreover, Current empirical research demonstrates that

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

"first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012)[13], and **"online offenders who had no history of contact offenses almost never committed contact sexual offenses."** Michael C. Seto et al., *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); see also Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012)[14] (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years). Accordingly, the rationale for incapacitation through lengthy terms of confinement is seriously undermined.

As several courts have recognized, the collateral consequences of Mr. Lockhart's conviction, such as registration as a sex offender, are relevant to the need for the sentence imposed to reflect just punishment. See, e.g., *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," id. § 3553(a)(2)(A), and "adequate deterrence," id. § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his

[13] *Available at*: https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Seto.pdf
[14] *Available at:* https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf

20

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis").  Mr. Lockhart must register as a sex offender for life, with the publication of that information to the community and any new friends or neighbors. As a result of his conduct, Mr. Lockhart has lost everything he valued: his career, his reputation, his financial viability, employment opportunities and relationships with friends, colleagues and his romantic partner. This conviction will forever put him at a disadvantage in every single one of those categories. These are heavy penalties that reflect the seriousness of the crime.

Section 3553(a) does not require the goal of retribution be met through a period of incarceration. *United States v. Edwards*, 595 F.3d 1004  (9th Cir. 2010).  "It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent  or punitive purpose. In *United States v. Autery,* the court's sua sponte variance to probation was considered reasonable in part because of onerous conditions of probation imposed upon Autery. 555 F.3d 864 (9th Cir. 2009). Probation has recommended that the same conditions at issue in *Autery* be imposed upon Mr. Lockhart. Pleading guilty to a federal child pornography crime immediately subjects the confesser to automatic lifetime continuous punishment: "being marked as a pariah with severe restrictions on residence, movements, activities and associations." *United States v. R.V.,* 157 F. Supp. 3d, 207, 210 (E.D.N.Y. 2016). Adding "unnecessary" and "unduly long" periods of incarceration to such a sanction is "inappropriate and it should be avoided." *Id*.

Finally, it is not wholly clear that a custodial sanction is the most emphatic reflection of the seriousness of the offense, or the one most desired by some victims. Mr. Lockhart's friend Matthew Lowe writes: "I was a victim of childhood sexual abuse, suffering my whole childhood at the hands of a sexual predator- my paternal grandfather. I spoke up at the age of 14 and my grandfather went to state prison for 20 years. I grew up thinking justice was served, but now I know that it wasn't….My grandfather wasn't rehabilitated or given a chance to heal from his own sexual abuse. Instead he was incarcerated to 'protect society.' Now he is living his last years out of prison as the same person he was when he went in. I believe the system has failed him and in doing so has failed me." Exhibit D. A prison

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

term is not the only way a man can repay his debt to society. In addition to forfeiting large swaths of his own autonomy and completing the raw work of his own rehabilitation, he can spend the rest of his days trying to make the world a better place for those he has harmed, something which Billy Lockhart will undoubtedly do.

### B. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

Mr. Lockhart has been thoroughly deterred. Both Dr. Longwell and Ms. O'Hara note in their reports that "[j]ust being arrested is the single most powerful child porn cessation/recovery tool. " Exhibit S at p. 8. "It is well established that most first-time sex offenders do not recidivate in any fashion as they learn their lesson from the experience of being charged with a sex offense. A review of the literature found 9 studies involving child pornography offenders with a total sample of 1,688 subjects and a follow-up period of between 1.5 to 6 years (with an average follow-up period of 3.4 years), with the following recidivism rates: 2.2% committed a new contact sex offense; 3.6% committed a new child pornography offense; and 4.2% committed a new violent (including sexual) offense." Exhibit S at p. 19. An average offender with Mr. Lockhart's CPORT score has a 4.2% chance of sexual reoffending. Certainly, Mr. Lockhart has an even lower likelihood of recidivism than these numbers suggest because he has far greater insight into his own behavior, deep remorse for his conduct, a variety of therapeutic resources and programming, and a wider network of support than the average first-time offender.

Moreover, the empirical evidence is unanimous that there is no relationship between sentence length and general *or* specific deterrence, regardless of the type of crime. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 14 (2017).[15] As a result, there is a large, international legal market for child pornography that exists whether Mr. Lockhart is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, see United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment 13* (2010) ["UNDOC, Globalization of Crime"],[16] and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009); *id*. at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission also acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." *Child Porn Report* at 98.

Most importantly, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC,

---

[15] *Available here*: http://www.icmec.org/wp-content/uploads/2017/03/OCP-Toolkit-2017.pdf
[16] *Available at:* http://www.unodc.org/res/cld/bibliography/the-globalization-of-crime-a-transnational-organized-crime-threat-assessment_html/TOCTA_Report_2010_low_res.pdf

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

Globalization of Crime at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); see also Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Mr. Lockhart has been thoroughly deterred and his personal path corrected. Imposing a lengthy period of incarceration on Mr. Lockhart will not deter the production or dissemination of child pornography.

**C. Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D)**

Over the last year-and-a-half, Mr. Lockhart's friends and family have witnessed a true transformation. His longtime friend John Medina writes: "I have watched him change his entire life in the last year and a half and fully take responsibility for what happened and work towards a better future. He has built a great healing environment in Palm Springs where I meet the community he has built that help him with his journey…Seeing him fight for his life over the last year and a half gives me hope that anyone with enough focus and perseverance and hard work can do the same." Exhibit P. His friend in recovery, Brett Loutensock, agrees: "It is my feeling that Mr. Lockhart is owning and stands to be responsible for his actions. Billy has expressed to me his sadness over his bad acts and I have personally witnessed a transformation in him over the past year and a half. My belief is that Billy has much to offer to our community, and he is making a sincere effort to atone for his bad acts and create a potential for a productive healthy future, not just for himself but for others with addiction problems."

Mr. Lockhart has been able to address his sex addiction for two reasons. First, he began to face his feelings on a daily basis and work through past trauma. Second, he came to believe that there was a reason for his struggle and pain, and that he must use his experiences to help others. As he quotes in his

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

letter: "I go through difficulties so that I can be helped, and so that I can later help someone else." Exhibit Q. Mr. Lockhart has already turned his pain into help for others. Many of his friends wrote to the Court about the impact Mr. Lockhart's efforts have had on their own recovery. "My friendship with Billy I believe to be an integral part of why I have been able to stay sober." Exhibit K, Letter from Matthew Fagan. "I am so grateful that Billy has stared this meeting, and I attended it every week as it has truly helped me to avoid addictive behavior patterns and change how I relate to my urges and difficult emotions." Exhibit C, Letter from Brett Loutensock. "In short, I believe it is in his true nature to help another person who is suffering, and I have witnessed that in my life." Exhibit E, Letter from Jeffrey Kerns. Herb Schultz adds: "Without any reservation, I can say Billy stands out because he shares much of himself as well as managing to keeping his own sobriety and long-term commitment to his own recovery. Billy owns up to his mistakes in multiple programs for sex addicts. I have witnessed the power of those words myself and participated in meetings in which he readily helps others in recovery." Exhibit I. Mr. Lockhart needs his community, and his community needs him. To place a man diagnosed with trauma- induced sexual compulsivity into an environment known for the trauma it inflicts is counterproductive. A non-custodial sentence will best ensure his continued rehabilitation and the safety of the community.

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART

## CONCLUSION

The chorus of voices behind Mr. Lockhart are all saying the same thing: "[s]hould your honor find it reasonable to show leniency when sentencing him, I believe that Billy would be worthy of it." Exhibit E. In this extraordinary case, for all the reasons set forth above, Mr. Lockhart respectfully requests that the Court sentence him to time served, followed by seven years of supervised release with any conditions the Court deems necessary, a $100 special assessment, no fine, and restitution to be determined.

Respectfully submitted,

November 20, 2018　　　　　　　　　　　　/s/
DATED　　　　　　　　　　　　　　STEVEN G. KALAR
　　　　　　　　　　　　　　　　Federal Public Defender
　　　　　　　　　　　　　　　　GABRIELA BISCHOF
　　　　　　　　　　　　　　　　Assistant Federal Public Defender
　　　　　　　　　　　　　　　　Northern District of California

26

*DEFENDANT'S SENTENCING MEMORANDUM*
BILLY JOHN LOCKHART